■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v GEORGE BANNISTER, HENRY RITZBERG, JEFFREY MCCALVIN and FLOYD MARTIN, Respondents.—Order of the Supreme Court, New York County (Jay Gold, J.), entered on January 18, 1989, which granted defendants' motion to suppress statements made by them to law enforcement officers, as well as physical and identification evidence against them, is unanimously reversed on the law and the motion to suppress denied as to all four defendants.

Detective Frank Schlimmer, a 23-year veteran of the New York City Transit Police Department, who was the sole witness at the suppression hearing, testified that on July 25, 1988, he had interviewed a man named Wright who had been arrested in connection with a robbery. Detective Schlimmer had had no previous contact with Wright, and thus, the latter's reliability was unknown. However, Wright stated that he was living in the Fort Washington Men's Shelter at 168th Street in Manhattan and was aware that a group of men, also residents of the shelter, were committing robberies on the subway and that one member of this group wore a brown hat with a Gucci emblem. Two days later, on July 27, 1988, Detective Schlimmer learned that earlier that day four men had robbed Joseph Contreras at knifepoint between 190th Street and Dyckman Street on a northbound "A" train. He thereafter reviewed a report prepared by another police officer with respect to the Contreras complaint and spoke with both the officer who had made out the report and Contreras himself. Contreras described the perpetrators as being four dirty, disheveled and malodorous black males in their mid-twenties. According to Contreras, the assailant who had wielded the knife was 5 feet, 11 inches in height, weighing 160 pounds, and wore a blue sweatshirt, blue jeans, brown shoes and a flowered fishing hat. A second man was 5 feet, 6 inches tall, weighing 150 pounds, wore a Gucci hat, dirty beige shirt and shorts and carried a white plastic bag. The third man was purported to have a slight beard, to be dressed in jeans and a

burgundy checked shirt and also to be armed with a knife. No specific details were provided concerning the fourth perpetrator.

Based upon Contreras' description and Wright's information, Detective Schlimmer and two other detectives, some five hours after the robbery, commenced a stakeout near the IRT entrance to the subway station at 168th Street and Broadway. Two anticrime officers in the area were also altered to the stakeout. At approximately 6:45 P.M., the four defendants walked by together. Defendant Martin was observed to be wearing a flowered fishing hat, while McCalvin had on a tan hat. Since Detective Schlimmer could not, from his vantage point, determine whether McCalvin's hat bore a Gucci emblem, the policemen followed the defendants for about five minutes to obtain a closer look at the hat. Although the four suspects separated briefly, two proceeding toward Broadway and the other two continuing north on St. Nicholas Avenue, they soon reunited on St. Nicholas Avenue. One of the officers was able to approach McCalvin and confirm that his hat contained a Gucci insignia. It should also be noted that except for the fact that McCalvin, the taller of the most particularized of the men, and Martin, the shorter of the two, were each wearing the hat attributed to the other, they closely matched the descriptions offered by Contreras. In addition, all four defendants were black males in their twenties, dirty, disheveled and malodorous. Therefore, the officers stopped defendants, placed them against the police car and frisked them, recovering a knife, some chains and a watch from McCalvin. The police also seized the two hats and the brown shoes.

Following defendants' arrest, they were removed to headquarters where they all made statements and subsequently placed in a lineup. In that regard, the hearing court found that defendants' statements were each obtained after a knowing, intelligent and voluntary waiver of their *Miranda* rights and that the lineups were not impermissibly suggestive. However, the court granted the motion to suppress the physical evidence, statements and lineup identification on the ground that defendants were arrested without probable cause. In the view of the court, the "descriptive information furnished by the informant of unproven reliability amounted to almost nothing at all. The descriptions given by Contreras were too general, and the points of similarity too few and too innocuous to justify the arrests some seven hours later at a location different from the site of the robbery."

At the outset, it is important to state that what is involved

here is not merely a vague description of possible perpetrators by an anonymous informant. While the reliability of Wright may not have been previously tested, his identity was certainly known to the police. Moreover, defendants were not arrested simply on the basis of his comments to Detective Schlimmer; indeed, while his information may not have amounted to much by itself, it became significant when considered in conjunction with the descriptions and other facts procured from the complainant, Contreras. Contrary to the hearing court's finding that the victim's descriptions were too general, Contreras supplied detailed information concerning at least two of his assailants. Although the complainant's description of the other two robbers was less specific than that of McCalvin and Martin, defendants Bannister and Ritzberg conformed to the age, sex, race, and disheveled and malodorous appearance described by Contreras. Further they were observed together in the company of McCalvin and Martin, who clearly fit the distinctive descriptions provided of them (notwithstanding the scarcely crucial factor that their hats were reversed), in the vicinity of the subway station near the Fort Washington Men's Shelter out of which, Wright had claimed, a group of residents, one of whom possessed a Gucci hat, was engaged in committing subway robberies, and the victim herein was robbed on a subway car between 190th Street and Dyckman Street, a short train ride from the men's shelter.

Thus, under the foregoing circumstances, the information provided by Wright and Contreras tended to corroborate each other, and it was not unreasonable for the police to put their respective statements together in an effort to apprehend the perpetrators. As the Court of Appeals declared in *People v McRay* (51 NY2d 594, 602), "[p]robable cause requires, not proof beyond a reasonable doubt or evidence sufficient to warrant a conviction * * * but merely information which would lead a reasonable person who possesses the same expertise as the officer to conclude, under the circumstances, that a crime is being or was committed". Applying this standard, sufficient facts were clearly present here upon which to predicate probable cause, and the officers acted reasonably in stopping and arresting all four defendants. Concur—Sullivan, J. P., Carro, Milonas, Wallach and Smith, JJ.